UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN F. WARREN,<br><br>             Plaintiff,<br><br>v.<br><br>CORIZON HEALTH; DR. APRIL DAWSON, M.D.; MICHAEL TAKAGI, PAC; DIANE DICE, PA-C; STEVEN STEDTFELD, PA-C; DAVID FOSS, NP; RYAN VALLEY, HSA; BRISTY DELAOE; JOHN DOE PROVIDER; JOHN DOE PROVIDER; STEVEN LITTLE; BRENT REINKE, DIRECTOR OF IDAHO DEPT. OF CORRECTIONS,<br><br>             Defendants. | Case No. 1:14-cv-00011-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Pending before the Court in this prisoner civil rights matter is Defendants' April Dawson, M.D., and Diana Dice, PA-C's Motion for Summary Judgment. (Dkt. 40.) The motion is now fully briefed.[1]

---

[1] The only claims allowed to proceed in this matter were the Section 1983 claims regarding over-prescribing of NSAID medications and intestinal bleeding, which claims were alleged against Defendants Dawson, Dice, Takagi, Stedtfeld, and Foss. (*See* Dkt. 3, 9, 25.)

**REPORT AND RECOMMENDATION  - 1**

Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court will decide this matter on the written motion, briefs and record without oral argument. Dist. Idaho L. Rule 7.1(d). The Court makes the following report and recommendation.

## FACTS

### 1. Background

Plaintiff, a prisoner in the custody of the Idaho Department of Correction (IDOC), filed his complaint against Defendants on January 10, 2014, alleging Corizon Health allows its medical providers to prescribe nonsteroidal anti-inflammatory drugs (NSAIDs), such as Ibuprofen, Meloxicam (Mobic), and Naproxen, that are known to cause intestinal bleeding and other health problems if used over a long period of time. Plaintiff claims that the decisions of the Defendant medical providers—Dr. April Dawson, Diana Dice, Michael Takagi, Steven Stedtfeld, and David Foss—to prescribe him this type of medication for four years has caused him to suffer from colon ulcers, intestinal bleeding, gastritis, inflammatory bowel disorder, and other injuries known to be linked to the use of NSAIDs. He alleges each Defendant acted with deliberate indifference in prescribing these medications to Plaintiff without providing precautionary information, knowing that the medications would cause Plaintiff injury. Additionally, Plaintiff brought state law claims under the Court's supplemental jurisdiction.

2.  **Undisputed Facts**[2]

Plaintiff has been incarcerated mostly at SICI and CWC-SICI since June 2, 2009, with brief stints at the Idaho State Correctional Institution ("ISCI"). Dr. Dawson is a medical doctor licensed to practice medicine in the State of Idaho who worked at the South Idaho Correctional Institution ("SICI") during the timeframe of Plaintiff's allegations. Diana Dice is a physician assistant licensed in the State of Idaho and she works primarily at SICI and the Correctional Work Center-South Idaho Correctional Institution ("CWC-SICI").

Plaintiff arrived in the Receiving Diagnostics Unit ("RDU") at ISCI on June 2, 2009. During screening in the RDU, Plaintiff reported having a heart condition, hypertension, and prior surgeries. He denied currently having or ever having stomach or liver trouble, hemorrhoids or rectal bleeding, or any bleeding tendencies. His medications at that time were Hydrochlorothiazide ("HCTZ"), Metoprolol, Captopril, Neurontin, Amlodipine, and Tramadol. The physical assessment demonstrated chronic low back pain and obesity. He was enrolled in the Chronic Disease Program ("CDP") and diagnosed with hypertension and paroxysmal supraventricular tachycardia (PSVT). He was also noted to have a history of congestive heart failure, and chronic low back pain. Plaintiff did not identify any issues relating to colon ulcers, intestinal bleeding, gastritis, or inflammatory bowel disorder.

---

[2] Defendants submitted Plaintiff's extensive medical records in support of their motion detailing the care and treatment he received both prior to his incarceration and during his incarceration. Plaintiff does not contest that his medical records, or the summary of them contained in Defendants' statement of undisputed facts, are untrue.

**REPORT AND RECOMMENDATION - 3**

Plaintiff was treated in relation to a variety of medical conditions upon his arrival at the RDU in June of 2009 through June 11, 2010. He was prescribed a variety of NSAIDs during that time, which included Mobic, Ibuprofen, Indocin, and Naproxen. He was also prescribed other pain medications such as Tylenol and Vicodin, and muscle relaxants such as Baclofen and Robaxin. These medications were prescribed for control of chronic pain, particularly degenerative back disease and, later, knee pain.

Dr. Dawson first assessed Plaintiff on June 10, 2010 when she reviewed an Echocardiogram conducted on Plaintiff. He was diagnosed at that time with obesity, with resulting risk for developing diabetes. Plaintiff suffered also from hypertension. Dr. Dawson did not make any order for NSAIDs in June 2010, but did order medication to address Plaintiff's hypertension.

The CDP follow-up with Steve Stedtfeld, P.A., occurred on July 20, 2010. Dr. Dawson reviewed the chart entry from the CDP follow-up on July 23, 2010, and ordered Plaintiff to be called to Medical to review his blood pressure medications and to check his blood pressure. Mike Takagi, P.A., instead assessed Plaintiff on August 4, 2010, and assessed him with new angina. P.A. Takagi ordered a cardiac stress test consult as a result, which Dr. Dawson concurred with. Dawson determined also that Plaintiff should be referred to physical therapy to address Plaintiff's low back pain. No orders for NSAIDs appear in the record in treatment notes for the summer of 2010.

Dr. Dawson next reviewed the consultation report for Plaintiff's stress test on September 14, 2010, which was normal. At that time, Plaintiff's hypertension was well controlled. No orders for NSAIDs were given at that time.

**REPORT AND RECOMMENDATION  - 4**

Dr. Dawson next assessed Plaintiff on January 11, 2011, in relation to a "flare of back pain" but without any specific injury. She assessed Plaintiff as having a low back pain flare and that he was obese with a fifty pound weight gain over the last year and a half. Dr. Dawson ordered an increase of Neurontin (1200 mg) to three times a day for thirty days, changed Robaxin to Baclofen for thirty days, and continued an existing order of Mobic. If there was no relief, she suggested he stop working, try physical therapy and possibly move to ISCI. She planned to avoid Ultram or narcotics if possible. She then ordered a follow-up in thirty days before the medication orders expired.

Dr. Dawson assessed Plaintiff again on February 8, 2011, during which Plaintiff indicated he did not feel better and he was "taking 'lots of Ibuprofen' off commissary in addition to Mobic." Dawson's assessment was chronic lumbar back pain due to degenerative joint disease/degenerative disc disease. She implemented a steroid taper and stressed the need to hold off on NSAIDs while on Prednisone and limit NSAID usage to the prescribed amount only. She then reviewed the gastrointestinal and renal risks with Plaintiff for these medications.

On March 1, 2011, P.A. Takagi assessed Plaintiff, who at that time refused physical therapy for his back pain.

Dr. Dawson's next assessment of Plaintiff occurred on May 23, 2011, which was her last assessment of Plaintiff until April of 2013. On that visit, Plaintiff reported a sudden onset of right flank pain. Dr. Dawson observed that he was not in any acute distress, that there were no masses or hemorrhoids in the rectal area, and that the prostate had mild symmetric enlargements and no masses but showed some tenderness. After

**REPORT AND RECOMMENDATION  - 5**

checking a hemoccult test, which tests for the presence of blood, and finding the results negative, Dawson assessed right flank pain of unknown etiology possibly related to the lack of Lasix. She also considered prostate obstruction due to prostatitis and treated it with Bactrim. She had no further personal involvement in the care and treatment of Plaintiff until April 23, 2013, as Plaintiff was transferred to CWC-SICI where she did not work.

On September 12, 2012, Plaintiff submitted a request for care advising he was out of Lasix and Mobic was no longer alleviating his knee pain. Diana Dice, P.A., reviewed his medications and responded on October 23, 2012, by discontinuing orders for Mobic, and changing it to Naproxen 500 mg twice daily for ninety days, given Plaintiff's comment that Mobic did not work and Naproxen did.

Dice next assessed Plaintiff on November 20, 2012, when he requested care for his knee. Dice arrived at a differential diagnosis—either a meniscal tear or ligament strain—and ordered an x-ray of his left knee. Dice ordered a refill of Plaintiff's Naproxen, and informed him he could use Ibuprofen off the commissary until his Naproxen arrived, but not to use both simultaneously.

Plaintiff requested care again on December 26, 2012, for his knee. On December 27, 2012, P.A. Dice assessed Plaintiff for left knee pain and suspected a possible meniscal tear. She discontinued the order of Naproxen and started Plaintiff on an order of Ibuprofen (600 mg) three times a day for ten days and indicated that Plaintiff should no longer take Naproxen.

**REPORT AND RECOMMENDATION - 6**

Dice assessed Plaintiff again on January 3, 2013, at which time Plaintiff reported no relief and that Ibuprofen had helped some. Dice did not order any further pain medications at that time, advising Plaintiff that he could continue using Ibuprofen for pain, and use a knee brace.

Dice next assessed Plaintiff on March 26, 2013, for complaints of pain in his right flank that began when he started taking Lisinopril again after about a two to three week absence. Dice ordered labs, and a follow up in one week. She advised Plaintiff that use of Ibuprofen for pain was not recommended until she could ensure his kidneys were functioning, and that he could use Tylenol if needed.

Gen Brewer, LPN, received the lab results on March 31, 2013, which were abnormal and suggested a possible bleed or anemia. Plaintiff was taken to the emergency room at Saint Alphonsus Regional Medical Center. Plaintiff's stools were guaiac negative for GI bleeding and he otherwise had no acute symptoms. He was diagnosed as having anemia and was sent back to the prison for follow up as it was determined that his condition could be worked up as an outpatient to determine the etiology of his low hemoglobin levels (6.6 gm/dl) and hematocrit of 20%. Plaintiff was admitted into the infirmary at ISCI where his condition was monitored and assessed, until discharge on April 4, 2013. The discharge summary indicated Plaintiff should avoid NSAIDs. Plaintiff was transferred to SICI on April 18, 2013.

Dice's later interactions with Plaintiff were infrequent after March 23, 2013. On June 10, 2013, she entered orders that were routine renewal of existing chronic care medications, which included an order of aspirin. The order for aspirin was discontinued

**REPORT AND RECOMMENDATION  - 7**

by Dr. Dawson about one week later. There is no indication in the medical records that Plaintiff actually received any aspirin at any time in June, August, September, October or November of 2013 from any care provider.

Dr. Dawson assessed Plaintiff on April 23, 2013, as having unexplained anemia and iron deficiency, which was improving. Because the cause was not identified, Dawson requested an esophagogastroduodenoscopy ("EGD") and colonoscopy. An EGD was performed on June 4, 2013, by Dr. Matt Sericati at the Idaho Gastroenterology Associates, LLP, which found mild inflammation characterized by erythema in the gastric antrum, and biopsies were taken. Dr. Sericati's diagnosis was gastritis, likely NSAID related. The colonoscopy revealed multiple small ulcers in the descending colon and transverse colon. Dr. Sericati suspected they were NSAID induced ulcers and the likely source of anemia.

Dr. Dawson assessed Plaintiff on June 18, 2013, for follow-up post EGD and colonoscopy, noting Plaintiff had been off NSAIDs since March of 2013. She determined that he could follow-up on an as needed basis, that he could not have NSAIDs but could have Tylenol, and that it was medically acceptable for him to go to CWC. She ordered Plaintiff to continue on Prilosec for his gastritis, and iron to address the anemia. By September 13, 2013, Plaintiff's hemoglobin levels were 15.6, which is within normal range. After the assessment, Dr. Dawson reviewed an email from Dr. Sericati recommending a repeat colonoscopy in a year's time (which was done).

On November 19, 2013, Dr. Dawson assessed Plaintiff noting his blood pressure was still increased but that it was better as was his adherence to medications. Plaintiff

**REPORT AND RECOMMENDATION  - 8**

complained of stomach cramps and gas. Her assessment noted poor control of hypertension despite multiple medications; that his gastrointestinal bleed with anemia was resolved (in light of his hemoglobin levels and no further signs or symptoms of bleeding), and that he had gastrointestinal gas and diarrhea potentially due to iron. Dr. Dawson discontinued iron and started Plaintiff on a trial of Mylanta Gas for gas. She ordered labs and a stool sample to check for hemoccult, and a follow up in two weeks.

On December 3, 2013, Plaintiff was brought from CWC to SICI in accordance with Dr. Dawson's order for follow up. Plaintiff reported Mylanta was minimally helpful and he had diarrhea and an upset stomach if he did not take Prilosec. Dr. Dawson noted Plaintiff's renal functions were within normal limits, and reemphasized he take no NSAIDs. She was waiting for the stool studies in relation to the upset stomach and diarrhea, and instructed Plaintiff to follow up if the upset stomach persisted.

On April 15, 2014, Dr. Dawson's clinic notes indicate Plaintiff's only complaint was "knee pain other than ongoing nose/sinus issues."

On July 15, 2014, Dawson submitted a consultation request for the repeat colonoscopy Dr. Sericati previously recommended. The colonoscopy was performed on September 4, 2014, and demonstrated mild to moderate inflammation probably from inflammatory bowel disease. Dr. Sericati's impressions indicate: "ileitis. ? Crohn's." (Dkt. 42-3.) A biopsy was taken which confirmed acute and chronic inflammation. Plaintiff followed up with Dr. Sericati on October 30, 2014, and was diagnosed with ulcerative colitis, which is a type of inflammatory bowel disease, and may cause bleeding from the rectum and diarrhea. In Dr. Dawson's experience, NSAID use may cause upper

**REPORT AND RECOMMENDATION  - 9**

GI (stomach and small intestine) bleeds but she had not seen NSAID use cause lower GI (colon and large intestine) bleeds. Dr. Sericati did not identify the cause of Plaintiff's ulcerative colitis. In light of this diagnosis of ulcerative colitis, Dr. Dawson was of the opinion that the ulcers in the colon and bleeding in 2013 were caused by inflammatory bowel disease as opposed to NSAID use.

P.A. Dice reviewed the results of the colonoscopy, and on December 23, 2014, she added a patient's choice diet for Plaintiff's ulcerative colitis. Her only other treatment notes in the record are from February and March of 2014, when P.A. Dice treated Plaintiff for ear pain and nasal congestion.

Plaintiff claims in his complaint that, as a result of the allegedly inadequate medical care he received in prison, specifically the prescribing of NSAIDs, he suffered ulcerative colitis, and that Defendants knew the damage that NSAIDs could cause yet prescribed it anyway. However, in his brief in response to Defendants' motion for summary judgment, Plaintiff claims that his "lack of pain care," specifically the non-prescribing of his pain medication to treat his back pain, is why he "never felt the symptoms of the GI bleed. The Plaintiff was so used to the constant pain that the new pains never broke through."

## DISCUSSION

1.   **Summary Judgment Standard**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

**REPORT AND RECOMMENDATION  - 10**

summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co.*, 336 F.3d at 889.

REPORT AND RECOMMENDATION - 11

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**REPORT AND RECOMMENDATION - 12**

## 2. Eighth Amendment Standard

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical

REPORT AND RECOMMENDATION - 13

needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

> The Ninth Circuit has defined a "serious medical need" in the following ways:
>
> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain [;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested

**REPORT AND RECOMMENDATION - 14**

by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285 (footnotes omitted).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). A delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. Additionally, differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

3.   **Analysis**

In support of their motion for summary judgment, Defendants have introduced sufficient evidence that Defendants did not act with deliberate indifference to either Plaintiff's complaints of pain, or the resulting GI distress complaints. Defendants treated Plaintiff's pain conservatively, and recommended physical therapy for his low back pain, which Plaintiff refused. When unexplained symptoms of right flank pain arose,

**REPORT AND RECOMMENDATION  - 15**

Defendants immediately sought outside tests and a consultation from a specialist. Follow up care ensued to ensure Plaintiff's symptoms resolved. The burden thus shifts to Plaintiff to show that a genuine dispute of material fact exists as to the Defendants' subjective state of mind during the course of Plaintiff's medical treatment. Plaintiff has failed to do so.

    **A.**    *Defendant Dawson*

Dr. Dawson first made a recommendation to treat Plaintiff's complaint of low back pain with Mobic and Neurontin on January 11, 2011. She reassessed him on February 8, 2011, during which time Plaintiff reported he did not feel better and was self-administering Ibuprofen from the commissary in addition to Mobic. Dr. Dawson thereafter limited Plaintiff's NSAID use, and reviewed the risks associated with taking the medications. It was also noted during this visit that Plaintiff refused physical therapy. Dr. Dawson's next assessment of Plaintiff occurred on May 23, 2011, which was her last assessment until April of 2013, when Plaintiff reported acute right flank pain.

On April 23, 2013, Dr. Dawson referred Plaintiff for an EGD, which revealed inflammation and small ulcers. There was only a suspected relationship with NSAID use. After that time, the records reflect Dr. Dawson discontinued NSAIDs, and Plaintiff's symptoms resolved. Dr. Dawson ordered the follow up test at the one year mark, which revealed different symptoms: this time inflammation from inflammatory bowel disease. Since his first EGD, Plaintiff had not been prescribed NSAIDs, and had been prescribed Tylenol for pain management. No cause was identified in relation to Plaintiff's inflammatory bowel disease.

**REPORT AND RECOMMENDATION - 16**

There is only a fleeting reference in the record to suggest that Plaintiff's use of NSAIDs caused the initial manifestation of ulcers and anemia, and none to suggest that Plaintiff's later development of ulcerative colitis was caused by NSAID use. Even assuming the prescription of Ibuprofen and other NSAID pain relievers for relief of Plaintiff's back and knee pain, there is nothing to suggest that Dr. Dawson subjectively drew any inference Plaintiff was at a substantial risk of serious harm from taking those medications. Upon review of the medical records, Dr. Dawson examined Plaintiff, understood his chief complaints were of pain, and gave him medication to alleviate the pain. Plaintiff has not shown that Dr. Dawson's decision to treat Plaintiff's low back and knee pain with NSAID medication "was medically unacceptable under the circumstances" or made "in conscious disregard of an excessive risk" to Plaintiff's serious medical needs. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted). Therefore, Plaintiff has not rebutted Defendants' evidence that Dawson did not deliberately disregard a substantial risk to Plaintiff's health.

### B.     *Defendant Dice*

Defendants have also presented evidence that Defendant Dice did not disregard a substantial risk of serious harm to Plaintiff throughout the course of Plaintiff's treatment for his low back and knee pain. P.A. Dice's treatment notes indicate she began treating Plaintiff on September 18, 2012. On that date, Plaintiff indicated Mobic was not working to alleviate his knee pain, and Dice later ordered he switch medication to Naproxen twice daily for the next ninety days. Dice next assessed Plaintiff on November 20, 2012, regarding his knee pain. She prescribed Naproxen, and advised Plaintiff to take Ibuprofen

**REPORT AND RECOMMENDATION - 17**

until his Naproxen arrived, but not to use both medications at the same time. On December 27, 2012, Dice again assessed Plaintiff for his knee pain, discontinued the Naproxen, and prescribed Ibuprofen. According to the medical records, Plaintiff tolerated the treatment well, reporting on January 3, 2013, he felt better when moving around and the Ibuprofen helped some. Dice did not see Plaintiff again until March 26, 2013, when he first complained of acute right flank pain. After his diagnosis in April of 2013, Dice ensured his medications were managed, which medications included aspirin.

The medical records establish that Defendant Dice reasonably monitored Plaintiff's pain complaints and his medication. Plaintiff has not shown that the initial treatment of his knee and back pain with NSAID pain relievers was medically unacceptable or was the result of a conscious disregard of an excessive risk. Even if the development of ulcers and anemia suggests negligence, Plaintiff has not brought forward sufficient evidence that Defendant Dice consciously disregarded a substantial risk of injury to Plaintiff's health.

### 4.   Remaining Defendants

In its initial review order, the Court advised Plaintiff that if he received a notice from Defendants indicating service will not be waived for an entity or certain individuals, Plaintiff would have an additional ninety (90) days from the date of such notice to file a notice of physical service addresses for the remaining Defendants, or claims against them would be dismissed without prejudice without further notice. Counsel provided notice that he would waive service only on behalf of Dawson and Dice. Thereafter, Plaintiff did not provide service addresses for Michael Takagi, Steven Stedtfeld and David Foss, the

**REPORT AND RECOMMENDATION  - 18**

three other named defendants against whom Plaintiff's Section 1983 claims were alleged, and the only other Defendants against whom Plaintiff was permitted to proceed.

Accordingly, the claims against the remaining Defendants may be dismissed without prejudice.

## CONCLUSION

Plaintiff has failed to raise a genuine issue of material fact demonstrating that Dr. Dawson and P.A. Dice were deliberately indifferent in relation to the over-prescription of NSAIDs claim. Because Plaintiff failed to provide service addresses for the remaining Defendants, the claims against Michael Takagi, Steven Stedtfeld, and David Foss may be dismissed without prejudice.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)     Defendants' Motion for Summary Judgment (Dkt. 40) be **GRANTED**.

2)     The claims against Michael Takagi, Steven Stedtfeld, and David Foss be dismissed without prejudice.

3)     Judgment be entered in favor of Defendants Dawson and Dice.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: December 8, 2015

_____
Honorable Candy W. Dale
United States Magistrate Judge